IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

ROY COOPER

PLAINTIFF,

-versus-

THE CITY OF NEW YORK, a municipal entity,
NEW YORK CITY POLICE OFFICER LOHMAN,
NEW YORK CITY POLICE OFFICERS
"JOHN DOES 1-2"

DEFENDANTS.

INDEX NO.
ECF CASE

COMPLAINT
[JURY TRIAL
DEMANDED]

Plaintiff ROY COOPER, by his attorneys, STECKLOW COHEN & THOMPSON, complaining of the defendants, respectfully allege as follows:

## I. PRELIMINARY STATEMENT

1.    Plaintiff ROY COOPER brings this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of his civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

2.    While completing a home improvement project with a few colleagues, Plaintiff ROY COOPER was approached by Defendant POLICE OFFICER LOHMAN and the Defendant "John Doe" POLICE OFFICERS (Collectively, "Defendant POLICE OFFICERS"), who asked Plaintiff ROY COOPER and his colleagues what they were doing. After Plaintiff ROY COOPER explained that they were completing a home improvement project, the Defendant POLICE OFFICERS —— while using offensive language and racial slurs —— proceeded to shove Plaintiff ROY COOPER; follow him into his house; administer a brutal beating upon him; arrest and detain him; and subsequently charge him with crimes and violations. Not one of the individual Defendant POLICE OFFICERS intervened on Plaintiff ROY COOPER's behalf. The Defendants charged Plaintiff ROY COOPER with Resisting Arrest and Disorderly Conduct. Plaintiff ROY COOPER neither resisted the Defendant POLICE OFFICERS' unlawful arrest nor engaged in Disorderly Conduct.  Plaintiff ROY COOPER was forced to appear before the court on approximately ten occasions before charges were dismissed following adjournments in contemplation of dismissal. The Defendant POLICE OFFICERS caused Plaintiff ROY COOPER to suffer physical injuries, emotional distress, embarrassment, humiliation, and a severe deprivation of his constitutional rights. In sum, Plaintiff ROY COOPER brings this action in a quest

1

for answers as to why he was punitively arrested without probable cause, brutally beaten, detained at length, and subjected to prosecution in the absence of criminal conduct.

## II. JURISDICTION

3.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(3) and (4) and the aforementioned statutory and constitutional provisions.

4.     Plaintiff ROY COOPER further invokes this Court's supplemental jurisdiction, pursuant to 28 USC. § 1367, over any and all State law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

## III. VENUE

5.     Venue is proper for the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the acts complained-of herein occurred in this district.

## IV. JURY DEMAND

6.     Plaintiff ROY COOPER respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## V. THE PARTIES

7.     At all times pertinent to this complaint, Plaintiff ROY COOPER is and was a resident of the City of New York, State of New York, and the County of Queens.

8.     Defendant CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

9.     Defendant CITY OF NEW YORK maintains the New York City Police Department ("NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York.

10.   That at all times hereinafter mentioned, the Defendant Police Officers "JOHN DOES 1-2" and Defendant POLICE OFFICER LOHMAN (collectively "Defendant POLICE OFFICERS" or individually "Defendant POLICE OFFICER") were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.

11.   Defendant POLICE OFFICER LOHMAN's shield number is 7378.

12.   The identities, *sui generis*, of the Defendant "John Doe" POLICE OFFICERS at issue here are known to Plaintiff ROY COOPER at this time.

13.   Defendant "John Doe I" POLICE OFFICER presented as Caucasian, stood about 5'10", had reddish-brown hair, appeared to be in his mid thirties, and was not wearing a police uniform during the incident and arrest in question.

14.   Defendant "John Doe II" POLICE OFFICER presented as Caucasian stood about 6'0", had dark brown hair, appeared to be in his mid thirties, and was not wearing a police uniform during the incident and arrest in question.

15.   Plaintiff ROY COOPER will amend this complaint to name the Defendant "John Doe" POLICE OFFICERS as their identities become available to Plaintiff ROY COOPER.

16.   That at all times hereinafter mentioned the Defendant POLICE OFFICERS were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

17.   Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting in furtherance and within the scope of their employment by Defendant CITY OF NEW YORK.

## VI. FACTS COMMON TO ALL CLAIMS

18.   Plaintiff ROY COOPER is a forty-year-old insurance professional.

19.   Plaintiff ROY COOPER is an African-American male who presents as black.

20.   On occasion, Plaintiff ROY COOPER helps low-income individuals and senior citizens find housing and subsequently helps them move into said.

21.   On the evening of March 23rd, 2011, Plaintiff ROY COOPER and four colleagues (Plaintiff's Colleagues) were fixing up a room in Plaintiff ROY COOPER's mother's house ("the house") for use as an additional bedroom for one such individual.

22.   Plaintiff ROY COOPER and his colleagues had just returned from a trip to Home Depot, where they had purchased additional supplies and tools for their work.

23.   At or around 10:00pm one or more of Plaintiff's Colleagues observed Defendant POLICE OFFICER LOHMAN, Defendant "John Doe I" POLICE OFFICER, and Defendant "John Doe II" POLICE OFFICER drive up to the house in an unmarked car.

24.   Several of Plaintiff's Colleagues were standing in and around the house's

3

front yard.

25.   One or more of the Defendant POLICE OFFICERS asked Plaintiff's Colleagues, in sum and substance, "What are you all doing, who lives there?"

26.   One or more of Plaintiff's Colleagues stated, in sum and substance, "ROY COOPER lives here."

27.   Plaintiff ROY COOPER was inside of the house.

28.   One or more of the Defendant POLICE OFFICERS requested that Plaintiff ROY COOPER step out of the house.

29.   Plaintiff ROY COOPER stepped out of the house.

30.   One or more of the Defendant POLICE OFFICERS stated to Plaintiff ROY COOPER, in sum and substance, "What the fuck are you doing?"

31.   In response, Plaintiff ROY COOPER asked, in sum and substance, "What do you mean?"

32.   In response, one or more of the Defendant POLICE OFFICERS stated, in sum and substance, "Just answer the question."

33.   One or more of the Defendant POLICE OFFICERS also stated, in sum and substance, "We have a smart ass on our hands" in reference to Plaintiff ROY COOPER.

34.   Defendant POLICE OFFICER LOHMAN and the Defendant "John Doe" POLICE OFFICERS began shoving Plaintiff ROY COOPER.

35.   Plaintiff ROY COOPER had not used offensive language toward the Defendant POLICE OFFICERS.

36.   Plaintiff ROY COOPER had not threatened to use force against the Defendant POLICE OFFICERS.

37.   Not one of the Defendant POLICE OFFICERS, in any way, attempted to intervene on behalf of Plaintiff ROY COOPER.

38.   The Defendant POLICE OFFICERS had no legally cognizable reason to shove Plaintiff ROY COOPER.

39.   As the Defendant POLICE OFFICERS continued shoving Plaintiff ROY COOPER, Plaintiff stated, in sum and substance, "We're just moving some things into the house."

40.   One or more of the Defendant POLICE OFFICERS stated, in sum and substance, "That's all you had to say."

41.   One or more of the Defendant POLICE OFFICERS stated, in sum and

substance, "You could have been robbing the house for all we know."

42. Defendant POLICE OFFICER LOHMAN looked at Plaintiff ROY COOPER in a threatening manner.

43. Defendant POLICE OFFICER LOHMAN looked at Plaintiff ROY COOPER in a manner that Plaintiff ROY COOPER perceived as threatening.

44. The Defendant POLICE OFFICERS began walking away from the house.

45. Plaintiff ROY COOPER headed back into the house.

46. Plaintiff ROY COOPER believed his interaction with the Defendant POLICE OFFICERS had ended.

47. Instead, Defendant POLICE OFFICER LOHMAN began walking back toward the house.

48. One of Plaintiff's Colleagues called out to Plaintiff ROY COOPER, in sum and substance, "Look out Roy!"

49. Plaintiff ROY COOPER turned and looked out the house's front door.

50. Defendant POLICE OFFICER LOHMAN rushed into the house.

51. Defendant POLICE OFFICER LOHMAN grabbed Plaintiff ROY COOPER by his shoulders.

52. Plaintiff ROY COOPER had not used offensive language toward Defendant POLICE OFFICER LOHMAN.

53. Plaintiff ROY COOPER had not threatened to use force against Defendant POLICE OFFICER LOHMAN.

54. Defendant POLICE OFFICER LOHMAN had no legally cognizable reason to grab Plaintiff ROY COOPER by his shoulders.

55. Defendant POLICE LOHMAN called Plaintiff ROY COOPER, in sum and substance, "A fucking N-gger."

56. Plaintiff ROY COOPER's mother was in the house.

57. Plaintiff ROY COOPER was hurt by Defendant POLICE OFFICER LOHMAN's aggressive conduct and offensive words.

58. Defendant POLICE OFFICER LOHMAN picked up Plaintiff ROY COOPER.

59. Defendant POLICE OFFICER LOHMAN threw Plaintiff ROY COOPER across the foyer.

60. Defendant POLICE OFFICER LOHMAN continued picking up and

throwing around Plaintiff ROY COOPER.

61.  Plaintiff ROY COOPER did not use force to defend himself against Defendant POLICE OFFICER LOHMAN's attack.

62.  Plaintiff ROY COOPER did not use force against Defendant POLICE OFFICER LOHMAN's attack because he suspected that any use of force would cause the Defendant POLICE OFFICERS to charge him with crimes or violations.

63.  Plaintiff ROY COOPER did not use force against Defendant POLICE OFFICER LOHMAN's attack because he suspected that any use of force would increase the severity of the beating that he was enduring.

64.  Plaintiff ROY COOPER believed that using force against Defendant POLICE OFFICER LOHMAN's attack would cause the Defendant POLICE OFFICERS to arrest him.

65.  Plaintiff ROY COOPER believed that using force against Defendant POLICE OFFICER LOHMAN's attack would cause the Defendant POLICE OFFICERS to arrest him and thus, subsequently, make it more difficult for him to support his wife and three children.

66.  Defendant POLICE OFFICER LOHMAN began repeatedly punching Plaintiff ROY COOPER in his face.

67.  Defendant POLICE OFFICER LOHMAN picked up Plaintiff ROY COOPER and threw him down in the house's living room.

68.  Defendant POLICE OFFICER LOHMAN continued shoving Plaintiff ROY COOPER.

69.  Defendant POLICE OFFICER LOHMAN's brutal beating of Plaintiff ROY COOPER caused Plaintiff ROY COOPER to fall against a metal radiator within the house.

70.  As result of Defendant POLICE OFFICER LOHMAN's brutal beating of Plaintiff ROY COOPER, Plaintiff's lower back made forceful impact with the metal radiator.

71.  Plaintiff ROY COOPER fell against the metal radiator and slid down onto the floor of the living room.

72.  Defendant POLICE OFFICER LOHMAN stated to Plaintiff ROY COOPER, in sum and substance, "You're going to jail tonight, you faggot."

73.  Plaintiff ROY COOPER was physically injured as well as mentally and emotionally hurt by Defendant POLICE OFFICER LOHMAN's conduct.

74.   The Defendant POLICE OFFICERS did not identify a need for Defendant POLICE OFFICER LOHMAN's attack.

75.   There was no legally recognizable need of Defendant POLICE OFFICER LOHMAN's attack.

76.   Defendant POLICE OFFICER LOHMAN picked Plaintiff ROY COOPER up off of the living room floor.

77.   Defendant POLICE OFFICER LOHMAN handcuffed and arrested Plaintiff ROY COOPER.

78.   One or more of the Defendant POLICE OFFICERS informed Plaintiff ROY COOPER that he was being arrested, in sum and substance, "For having a big fucking mouth."

79.   Plaintiff ROY COOPER had not spoken "fighting words", i.e. words that by their very utterance could inflict injury or tend to incite an immediate breach of the peace.

80.   Defendant POLICE OFFICER LOHMAN walked Plaintiff ROY COOPER out of the house.

81.   At no point did the Defendant "John Doe" POLICE OFFICERS attempt to intervene on Plaintiff ROY COOPER's behalf.

82.   Plaintiff ROY COOPER's mother walked out of the house.

83.   Plaintiff ROY COOPER's mother asked Defendant POLICE OFFICER LOHMAN, in sum and substance, "What's going on?"

84.   Defendant POLICE OFFICER LOHMAN stated, in sum and substance, "Your son can't keep his mouth shut."

85.   Plaintiff ROY COOPER's mother asked Defendant POLICE OFFICER LOHMAN, in sum and substance, "Why are you arresting my son?"

86.   Defendant POLICE OFFICER LOHMAN stated, in sum and substance, "Because he couldn't keep his mouth shut.  Shut up before you get arrested as well."

87.   On information and belief, Defendant POLICE OFFICER LOHMAN's statement echoes the custom or practice of NYPD officers wherein officers retaliate against individuals who inquire as to officers' reason(s) for making an arrest.

88.   At or around this time, Plaintiff ROY COOPER's mother stated to Defendant POLICE OFFICER LOHMAN, in sum and substance, "My daughter works in the law, please just tell me what's going on?"

89.   Defendant POLICE OFFICER LOHMAN asked, in sum and substance,

"What does she do?"

90.  Plaintiff ROY COOPER's mother then stated, in sum and substance, "She works as a court reporter."

91.  Defendant POLICE OFFICER LOHMAN stated, in sum and substance, "She's a piece of shit."

92.  Plaintiff ROY COOPER's mother was hurt by Defendant POLICE OFFICER LOHMAN's offensive words regarding her daughter.

93.  Plaintiff ROY COOPER's mother was hurt by Defendant POLICE OFFICER LOHMAN's threat to arrest her.

94.  Plaintiff ROY COOPER was hurt by Defendant POLICE OFFICER LOHMAN's offensive words in regards to his sister.

95.  Plaintiff ROY COOPER was hurt by Defendant POLICE OFFICER LOHMAN's threat to arrest his mother.

96.  Plaintiff ROY COOPER's mother was hurt and frustrated by Defendant POLICE OFFICER LOHMAN's refusal to provide information regarding her son's arrest.

97.  Plaintiff ROY COOPER was hurt and frustrated by Defendant POLICE OFFICER LOHMAN's refusal to provide any information regarding his arrest.

98.  Plaintiff ROY COOPER was hurt and frustrated by Defendant POLICE OFFICER LOHMAN's vicious language and conduct towards Plaintiff ROY COOPER's mother.

99.  Defendant POLICE OFFICER LOHMAN walked Plaintiff ROY COOPER toward the unmarked car and put him into the same.

100. Defendant POLICE OFFICER LOHMAN sat next to Plaintiff ROY COOPER in the unmarked car's backseat.

101. One of the Defendant "John Doe" POLICE OFFICERS began driving the car away from the house.

102. Defendant POLICE OFFICER LOHMAN again looked at Plaintiff ROY COOPER in a threatening manner.

103. Defendant POLICE OFFICER LOHMAN again looked at Plaintiff ROY COOPER in a manner that Plaintiff ROY COOPER perceived as threatening.

104. Defendant POLICE OFFICER LOHMAN slid over and pinned Plaintiff ROY COOPER tightly against the car's inside.

105. Defendant POLICE OFFICER LOHMAN stated to Plaintiff ROY COOPER, in sum and substance, "You just had to run your mouth, you just had to run your

mouth."

106. The Defendant POLICE OFFICERS repeated Defendant POLICE OFFICER LOHMAN's statement.

107. Plaintiff ROY COOPER was physically injured and mentally and emotionally hurt, terrified and embarrassed as a result of the Defendant POLICE OFFICERS' speech and conduct.

108. The Defendant POLICE OFFICERS and Plaintiff ROY COOPER arrived at the 113th Precinct.

109. Defendant POLICE OFFICER LOHMAN walked Plaintiff ROY COOPER into the 113th Precinct.

110. Defendant POLICE OFFICER LOHMAN continued to shove and berate Plaintiff ROY COOPER.

111. Plaintiff ROY COOPER began experiencing pain and numbness in his left leg.

112. Plaintiff ROY COOPER's leg caused him significant discomfort.

113. Following the incident and arrest in question, Plaintiff ROY COOPER continued to experience ongoing pain in both of his legs.

114. Upon information and belief, back injuries and spinal injuries can cause pain and numbness in the injured person's extremities.

115. The Defendant POLICE OFFICERS put Plaintiff ROY COOPER into a holding cell within the 113th Precinct.

116. At or around this time, Plaintiff ROY COOPER's wife arrived at the 113th Precinct.

117. Plaintiff ROY COOPER's wife asked one or more of the Defendant POLICE OFFICERS, in sum and substance, "What was my husband arrested for?"

118. The Defendant POLICE OFFICERS refused to respond.

119. Upon information and belief, the Defendant POLICE OFFICERS did not respond because they had no legitimate or legally cognizable reason for arresting Plaintiff ROY COOPER.

120. Upon information and belief, the Defendant POLICE OFFICERS did not respond because the Defendant POLICE OFFICERS did not respond because they did not know why Plaintiff ROY COOPER had been arrested.

121. The Defendant POLICE OFFICERS detained Plaintiff ROY COOPER until approximately 5:00am the next morning.

122. At or around 5:00am, the Defendant POLICE OFFICERS transferred Plaintiff ROY COOPER to Queens Criminal Court and Central Booking ("Central Booking").

123. Upon arrival, the Defendant POLICE OFFICER put Plaintiff ROY COOPER into another holding cell.

124. There the Defendant POLICE OFFICERS detained Plaintiff ROY COOPER until approximately 11:00am.

125. Plaintiff ROY COOPER went before a judge after the Defendant POLICE OFFICERS released him from the holding cell.

126. Plaintiff ROY COOPER was informed that he had been had charged with Resisting Arrest and Disorderly Conduct.

127. Plaintiff ROY COOPER committed neither offense and thus pled not guilty to both charges.

128. Following the incident and arrest in question the Defendant POLICE OFFICERS charged Plaintiff ROY COOPER with violating PL § 205.30 – Resisting Arrest, a Class A Misdemeanor, and PL § 240.20(2) Disorderly Conduct [making unreasonable noise], a violation and not a crime.

129. There was no basis in fact for charging Plaintiff ROY COOPER with Resisting Arrest.

130. On information and belief, the allegations set forth in the initial criminal complaint regarding Plaintiff ROY COOPER's Resisting Arrest charge were entirely false.

131. The Defendant POLICE OFFICERS falsely alleged that Plaintiff ROY COOPER resisted arrest by flailing his arms.

132. Plaintiff ROY COOPER did no such thing.

133. Following the incident and arrest in question, the Defendant POLICE OFFICERS falsely alleged that Plaintiff ROY COOPER engaged in disorderly conduct by making unreasonable noise by yelling at an unreasonable volume and causing a crowd to gather.

134. There was no basis in fact for charging Plaintiff ROY COOPER with Disorderly Conduct.

135. On information and belief, the allegations set forth in the initial criminal complaint regarding Plaintiff ROY COOPER's Disorderly Conduct charge were entirely false.

136. At no point during the incident and arrest in question did Plaintiff ROY COOPER make unreasonable noise by yelling at an unreasonable volume (or

through any other conduct, action, or mechanisms) or cause a crowd to gather.

137. The crowd that the Defendant POLICE OFFICERS falsely alleged that Plaintiff ROY COOPER "caused to gather" was, at most, only Plaintiff's Colleagues and family who were present in and around the house before the Defendant POLICE OFFICERS arrived, and who gathered, if for any reason, due to the brutal seizure and beating of Plaintiff ROY COOPER by the Defendant POLICE OFFICERS.

138. Plaintiff ROY COOPER appeared before the court on approximately ten additional occasions.

139. Both charges were eventually dismissed following an adjournment in contemplation of dismissal.

140. Following this incident, Plaintiff ROY COOPER continued to experience ongoing pain and discomfort in both his lower back as well as in his legs.

141. Plaintiff ROY COOPER had not experienced pain and discomfort in his lower back or legs prior to the incident described herein.

142. Plaintiff ROY COOPER's ongoing pain and discomfort was so debilitating that he, on multiple occasions, was unable to walk, stand, or sit in certain positions.

143. Due to this pain and discomfort, Plaintiff ROY COOPER visited Franklin Hospital's emergency room.

144. At Franklin Hospital, x-rays and CT scans were taken of Plaintiff ROY COOPER's back.

145. On information and belief, the doctor who examined Plaintiff ROY COOPER at Franklin Hospital diagnosed Plaintiff ROY COOPER with a herniated ruptured disc.

146. Upon information and belief, a herniated ruptured disc injury may be caused by a sudden trauma such as a fall or an accident.

147. Upon information and belief, the Defendant POLICE OFFICERS' brutal beating and arrest of Plaintiff ROY COOPER caused his herniated ruptured disc injury.

148. At no point between the date of the incident and arrest in question and Plaintiff ROY COOPER's arrival at Franklin Hospital's emergency room did Plaintiff ROY COOPER suffer a fall or accident.

149. The doctor who examined Plaintiff ROY COOPER at Franklin Hospital recommended that Plaintiff ROY COOPER receive surgery for the injury.

150. Plaintiff ROY COOPER received surgery on his back approximately three

days after this recommendation.

151. Plaintiff ROY COOPER received surgery due to the significant pain that he was experiencing in his lower back and legs.

152. Plaintiff ROY COOPER received surgery despite being advised of all of the risks of the surgery.

153. Such risks included, but were not limited to, bleeding, infection, worsening of neurological condition, failure to improve pain and dysfunction, spinal fluid leak, need for further surgery, coma, and death.

154. Upon information and belief, Plaintiff ROY COOPER received surgery due to the alternative methods' diminished likelihood for relieving the pain that he was experiencing.

155. Following this surgery, Plaintiff ROY COOPER spent approximately four weeks in Winthrop Hospital.

156. After checking out of Winthrop Hospital, Plaintiff ROY COOPER spent approximately six weeks at home in order to continue his recovery from the surgery.

157. Plaintiff ROY COOPER could not work during this time.

158. Plaintiff ROY COOPER lost appointments, contracts, and clients during this time.

159. Plaintiff ROY COOPER has been forced to explain why he had a criminal charge pending against him to potential employers and clients.

160. Plaintiff ROY COOPER, on such occasions, has been embarrassed to have been, in essence, forced to explain the circumstances surrounding the incident and arrest in question to those whom he was interacting with as part of his professional career.

161. In addition, Plaintiff ROY COOPER has been embarrassed to have been forced to explain the circumstances surrounding the incident and arrest in question to those whom he interacts with as part of his personal life.

162. Plaintiff ROY COOPER, on such occasions, has been hurt and embarrassed to have to recall, remember, and re-live the events and circumstances surrounding the incident and arrest in question.

163. On information and belief, the arrest of Plaintiff ROY COOPER was motivated in whole or in part by the Defendant POLICE OFFICERS' need to meet quantitative enforcement "productivity goals" promulgated by the Defendant CITY OF NEW YORK.

164. On information and belief, the arrest of Plaintiff ROY COOPER was

motivated in whole in part by the Defendant POLICE OFFICERS' need to meet quantitative enforcement "productivity goals" promulgated by policymakers and/or supervisory staff of Defendant CITY OF NEW YORK's police department.

165. On information and belief, the charges proffered against Plaintiff ROY COOPER by the Defendant POLICE OFFICERS were "cover-charges" brought in order to justify the Defendant POLICE OFFICERS' illegal "Contempt of Cop" arrest.

166. On information and belief, the charges proffered against Plaintiff ROY COOPER were "cover-charges" brought by the Defendant POLICE OFFICERS in order to justify the Defendant POLICE OFFICERS' use of excessive force against Plaintiff ROY COOPER.

167. On information and belief, the particular arrest of Plaintiff ROY COOPER is believed to have been motivated in whole or in part by a custom or practice of "Racism of Ready Victimization", not of hate, whereby minority individuals are charged with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration, in the absence of probable cause to arrest, due to perceived ease of prosecution of such minority individuals.

168. More information relating to the above constitutionally impermissible conduct of Defendants can be found in the appendix attached hereto, "ADDITIONAL FACT PLEADINGS IN SUPPORT OF MONELL CLAIMS."

169. As a result of the aforementioned conduct, the Defendant POLICE OFFICERS have violated Plaintiff ROY COOPER's constitutional rights to equal protection, and Plaintiff ROY COOPER is entitled to seek redress under 42 U.S.C. § 1983, and is further entitled to injunctive relief to the extent necessary to prevent further disparate treatment and retaliation.

170. The foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department were the direct and proximate cause of the constitutional violations suffered by Plaintiff ROY COOPER as alleged herein.

171. The foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department were the moving force behind the constitutional violations suffered by Plaintiff ROY COOPER as alleged herein.

172. As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department, Plaintiff ROY COOPER was subjected to excessive force, false arrest, and excessive and unnecessary detention.

173. As a result of the foregoing, Plaintiff ROY COOPER was caused to suffer personal injuries, violations of his civil rights, negligent and intentional infliction of emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses, and damage to his reputation and standing within his community.

174. As a result of the foregoing, Plaintiff ROY COOPER demands judgment against Defendants in a sum of money to be determined at trial.

---

FIRST CLAIM FOR RELIEF
DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

175.  Plaintiff ROY COOPER repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

176. All of the aforementioned acts of the Defendant CITY OF NEW YORK, Defendant POLICE OFFICER LOHMAN, and the Defendant "John Doe" POLICE OFFICERS, their agents, servants and employees, ("Defendants" henceforth, unless referred to as otherwise) were carried out under the color of state law.

177. All of the aforementioned acts deprived Plaintiff ROY COOPER of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

178. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

179. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

180. Defendant POLICE OFFICER LOHMAN, the Defendant "John Doe" POLICE OFFICERS and Defendant City Of New York, collectively and individually, while acting under color of state law, engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

181. As a result of the above constitutionally impermissible conduct, Plaintiff ROY COOPER was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of

property, damage to property, legal expenses and damage to his reputation and standing within his community.

182. As a result of Defendants' impermissible conduct, Plaintiff ROY COOPER demands judgment against Defendants in a sum of money to be determined at trial.

## SECOND CLAIM FOR RELIEF
## FALSE ARREST UNDER 42 U.S.C. § 1983

183. Plaintiff ROY COOPER repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

184. As a result of the aforesaid conduct by Defendants, Plaintiff ROY COOPER was subjected to an illegal, improper and false arrest by Defendants and taken into custody and caused to be falsely imprisoned, detained and confined without any probable cause, privilege or consent.

185. As a result of the above constitutionally impermissible conduct, Plaintiff ROY COOPER was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, legal expenses and damage to his reputation and standing within his community.

186. As a result of Defendants' impermissible conduct, Plaintiff ROY COOPER demands judgment against Defendants in a sum of money to be determined at trial.

## THIRD CLAIM FOR RELIEF
## FAILURE TO INTERVENE UNDER 42 U.S.C. §1983

187. Plaintiff ROY COOPER repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

188. The Defendants had an affirmative duty to intervene on Plaintiff ROY COOPER'S behalf to prevent the above-referred violations of their constitutional rights.

189. Defendants failed to intervene on Plaintiff ROY COOPER'S behalf to prevent the violation of his constitutional rights despite having had realistic opportunities to do so.

190. Defendants failed to intervene on Plaintiff ROY COOPER's behalf to prevent the violation of his constitutional rights despite having substantially contributed to the circumstances within which Plaintiff ROY COOPER's rights were violated by their affirmative conduct.

191. As a result of the aforementioned conduct of the individual defendants,

Plaintiff ROY COOPER'S constitutional rights were violated.

192. As a result of the above constitutionally impermissible conduct, Plaintiff ROY COOPER was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, legal expenses and damage to his reputation and standing within his community.

193. As a result of Defendants' impermissible conduct, Plaintiff ROY COOPER demands judgment against Defendants in a sum of money to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### EXCESSIVE FORCE UNDER 42 U.S.C. § 1983

194. Plaintiff ROY COOPER repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

195. Defendants administered a brutal beating upon Plaintiff ROY COOPER in the absence of need for such action and force.

196. Defendants threw, shoved, and subjected Plaintiff ROY COOPER to several physically aggressive maneuvers without identifying a requisite need for such action and force.

197. Defendants repeatedly punched Plaintiff ROY COOPER.

198. Defendants repeatedly picked up and threw down Plaintiff ROY COOPER.

199. Defendants used offensive language toward Plaintiff ROY COOPER.

200. Defendants unnecessarily handcuffed Plaintiff ROY COOPER.

201. The level of force employed by Defendants against Plaintiff ROY COOPER was objectively unreasonable.

202. The force employed by Defendants against Plaintiff ROY COOPER did not advance any proper government objective.

203. As a result of the aforementioned conduct of Defendants, Plaintiff ROY COOPER was subjected to excessive force and sustained physical injuries.

204. Upon information and belief, as a result of the aforementioned conduct of Defendants, Plaintiff ROY COOPER suffered and sustained a herniated ruptured disc.

205. As a result of the aforementioned conduct of Defendants, Plaintiff ROY COOPER suffered numbness in his left leg.

206. As a result of the aforementioned conduct of Defendants, Plaintiff ROY COOPER suffered on-going pain and discomfort in both of his legs.

207. As a result of the above constitutionally impermissible conduct, Plaintiff ROY COOPER was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, legal expenses and damage to his reputation and standing within his community.

208. As a result of Defendants' impermissible conduct, Plaintiff ROY COOPER demands judgment against Defendants in a sum of money to be determined at trial.

FIFTH CLAIM FOR RELIEF
MUNICIPAL LIABILITY UNDER MONELL

209. Plaintiff ROY COOPER repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

210. Plaintiff also incorporates herein by reference the contents of the appendix attached hereto, "ADDITIONAL FACT PLEADINGS IN SUPPORT OF MONELL CLAIMS.

211. Defendant POLICE OFFICERS used excessive force on Plaintiff ROY COOPER in the absence of any evidence of criminal wrongdoing or other justification for the use of such force, notwithstanding their knowledge that said uses of force were unreasonable, unjustified, and would jeopardize Plaintiff ROY COOPER's liberty, well-being, safety and constitutional rights.

212. Defendants arrested and incarcerated Plaintiff ROY COOPER in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that said arrest and incarceration would jeopardize Plaintiff ROY COOPER'S liberty, well-being, safety and constitutional rights.

213. The aforementioned Defendants in their capacities as police officers and officials carried out the acts complained of, with all the actual and/or apparent authority attendant thereto.

214. The acts complained of were carried out by the aforementioned Defendants in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

215. The aforementioned customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department include, but are not limited to, the following unconstitutional practices:

a.  wrongfully arresting individuals without probable cause due to perceived lack of respect for the police officer (i.e., "contempt of cop" arrests);

b.  wrongfully arresting individuals without probable cause in attempts to justify excessive uses of force (i.e. "contempt of cop" "cover charge" arrests; condoning brutality);

c.  wrongfully arresting innocent persons in order to meet quantitative "productivity goals" (i.e., arrest quotas).

d.  wrongfully arresting persons without probable cause due to perceived lack of respect for the police officer; in order to teach a lesson in respect while also satisfying quantitative "productivity goals" (i.e., "contempt of cop" arrests used to satisfy arrest quotas).

216. As a result of the aforementioned conduct of the Defendants, Plaintiff's constitutional rights were violated.

217. As a result of the above constitutionally impermissible conduct, Plaintiff ROY COOPER was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, legal expenses and damage to his reputation and standing within his community.

218. As a result of Defendants' impermissible conduct, Plaintiff ROY COOPER demands judgment against Defendants in a sum of money to be determined at trial.

## SIXTH CLAIM FOR RELIEF
## EQUAL PROTECTION UNDER 42 U.S.C. § 1983

219. Plaintiff ROY COOPER repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

220. Plaintiff also incorporates herein by reference the contents of the appendix attached hereto, "ADDITIONAL FACT PLEADINGS IN SUPPORT OF MONELL CLAIMS.

221. At all times described herein, Plaintiff ROY COOPER was possessed of the right to equal protection under the laws, as guaranteed under the 14th Amendment to the United States Constitution.

222. Defendants arrested and incarcerated Plaintiff ROY COOPER in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that said arrest and incarceration would jeopardize his liberty, well-

being, safety and constitutional rights.

223. The acts complained of were carried out by the Defendants in their capacities as police officers and officials, with all the actual and/or apparent authority attendant thereto.

224. The acts complained of were carried out by the Defendants in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the Defendant CITY OF NEW YORK and the New York City Police Department, all under the supervision of ranking officers of said department.

225. Plaintiff ROY COOPER was falsely accused of crimes and violations and was taken into Police custody and detained against his will.

Plaintiff ROY COOPER was charged with crimes and violations.

226. The above described charges were pretexts intended to justify Defendants' illegal arrest of Plaintiff ROY COOPER.

227. That the actions of Defendants heretofore described, constituted unlawful detention, imprisonment, assault and battery and malicious prosecution and were designed to and did cause specific bodily harm, pain and suffering both in violation of Plaintiff ROY COOPER'S Constitutional rights as guaranteed under 42 U.S.C. §1983 and the United States Constitution, Fourth and Fourteenth Amendments and the Constitution of the State of New York and in direct retaliation for Plaintiff ROY COOPER'S exercise of his civil and constitutional rights of free, free expressive association as guaranteed by the Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

228. The particular arrest of Plaintiff ROY COOPER is believed to have been motivated in whole or in part by a custom or practice of racism of ready victimization, not of hate, whereby minority individuals are charged with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration, in the absence of probable cause to arrest, due to a perceived ease of prosecution of such minority individuals.

229. The particular arrest of Plaintiff ROY COOPER is believed to have been motivated in whole or in part by a custom or practice of racism of victimization, not of hate, whereby minority individuals are charged with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration, in the absence of probable cause to arrest, due to a perceived ease of prosecution of such minority individuals, because Defendants arrested Plaintiff ROY COOPER after it was already established that Plaintiff ROY COOPER was not carrying any weapons or illegal substances, and did not have any outstanding warrants against him.

230. Defendants, through their actions, carried out a discriminatory application of such laws, driven by a discriminatory motivation of what might otherwise be facially neutral statutes due to a perceived ease of prosecution.

231. As a result of the aforementioned conduct, Defendants have violated Plaintiff ROY COOPER'S constitutional rights to equal protection, and Plaintiff ROY COOPER is entitled to seek redress under 42 U.S.C. §1983, and is further entitled to injunctive relief to the extent necessary to prevent further disparate treatment and retaliation.

232. The foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department were the direct and proximate cause of the constitutional violations suffered by Plaintiff ROY COOPER as alleged herein.

233. The foregoing customs, policies, usages, practices, procedures, and rules of Defendant CITY OF NEW YORK and the New York City Police Department were the moving force behind the constitutional violations suffered by Plaintiff ROY COOPER as alleged herein.

234. As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department, Plaintiff ROY COOPER was subjected to excessive force, false arrest, and excessive and unnecessary detention.

235. As a result of the foregoing, Plaintiff ROY COOPER was caused to suffer personal injuries, violations of his civil rights, negligent and intentional infliction of emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses, and damage to his reputation and standing within his community.

236. As a result of the foregoing, Plaintiff ROY COOPER demands judgment against Defendants in a sum of money to be determined at trial.

SEVENTH CLAIM FOR RELIEF
RETALIATION FOR FIRST AMENDMENT
PROTECTED EXPRESSION UNDER 42 U.S.C. § 1983

237. Plaintiff ROY COOPER repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

238. At or around the time that Plaintiff ROY COOPER came into contact with Defendants, he engaged in protected speech or conduct.

239. The particular content of Plaintiff ROY COOPER's speech that caused Defendants to retaliate against Plaintiff ROY COOPER is, at this point, unclear.

240. However, the retaliatory nature of the Defendants' acts was evidenced when one or more of the Defendants told Plaintiff ROY COOPER's mother, in sum and substance, "We arrested ROY COOPER because he couldn't keep his mouth shut."

241. Defendants took adverse action against Plaintiff ROY COOPER in response to Plaintiff ROY COOPER engaging in protected speech and conduct.

242. Defendants took adverse actions against Plaintiff ROY COOPER by using wrongful and unjustified force upon him.

243. Defendants took adverse action against Plaintiff ROY COOPER by unlawfully arresting him.

244. Defendants took adverse action against Plaintiff ROY COOPER by falsely accusing him of crimes and violations.

245. Defendants took adverse action against Plaintiff ROY COOPER by taking him into Police custody and detaining him against his will.

246. Upon information and belief, there was a causal connection between the protected speech and conduct engaged in by Plaintiff ROY COOPER and the adverse actions taken by Defendants.

247. The causal connection between the protected speech and conduct engaged in by Plaintiff ROY COOPER and the adverse actions taken against him by Defendants was demonstrated by, among other things, the fact that Defendants used excessive force against Plaintiff ROY COOPER in the absence of justification.

248. Plaintiff ROY COOPER was taken into police custody and detained against him will.

249. Following his arrest, Plaintiff ROY COOPER was subject to prosecution.

250. The above-described charges were a pretext intended to justify Defendants' illegal arrest of Plaintiff ROY COOPER.

251. The actions of the Defendants heretofore described, constituted unlawful detention, imprisonment, assault and battery and were designed to and did cause bodily harm, pain and suffering both in violation of Plaintiff ROY COOPER's constitutional rights as guaranteed under 42 U.S.C. §1983 and the United States Constitution, Fourth and Fourteenth Amendments and the Constitution of the State of New York and in direct retaliation for him exercise of his civil and constitutional rights of free speech, free expression and expressive association as guaranteed by First and Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

252. That the conduct and actions of Defendants acting under color of State law, in assaulting, detaining and imprisoning Plaintiff ROY COOPER were done intentionally, maliciously, and/or with a reckless disregard for the natural and probable consequences of their acts, were done without lawful justification, and were designed to and did cause bodily harm, pain and suffering both in violation of the Plaintiff's Constitutional rights as guaranteed under 42 U.S.C. §1983, the United States Constitution, First, Fourth and Fourteenth Amendments and the Constitution of the State of New York and in direct retaliation for Plaintiff COY COOPER's exercise of his civil and constitutional rights of free speech, free expression and expressive association as guaranteed by First and Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

253. Defendants deprived Plaintiff ROY COOPER of his liberty in violation of both his civil and constitutional rights, as guaranteed under 42 U.S.C. §1983 and set forth in the United States Constitution, First, Fourth and Fourteenth Amendments and the Constitution of the State of New York and in direct retaliation for his exercise of his civil and constitutional rights of free speech, free expression and expressive association as guaranteed by First and Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

254. Defendants' actions were undertaken under color of law and would not have existed but for Defendants using their official power.

255. Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating the constitutional rights of Plaintiff ROY COOPER.

256. Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers, and were directly responsible for the violation of Plaintiff ROY COOPER's constitutional rights.

257. All of the foregoing acts by Defendants deprived Plaintiff ROY COOPER of federally protected rights, including, but not limited to, the right:

    A. Not to be deprived of liberty without due process of law;

    B. To be free from seizure and arrest not based upon probable cause;

    C. To free speech and expression; and

    D. To receive equal protection under the law.

258. As a result of the above constitutionally impermissible conduct, Plaintiff ROY COOPER was caused to suffer personal injuries, violation of his civil rights,

emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, legal expenses and damage to his reputation and standing within his community.

259. As a result of Defendants' impermissible conduct, Plaintiff ROY COOPER demands judgment against Defendants in a sum of money to be determined at trial.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory and punitive damages.

[c] Award appropriate declaratory and injunctive relief.

[d] Empanel a jury.

[e] Award attorney's fees and costs.

[f] Award such other and further relief as the Court deems to be in the interest of justice.

DATED:     New York, New York
           November 30, 2012

Respectfully submitted,

SAMUEL B. COHEN [SC 0622]
STECKLOW COHEN & THOMPSON
10 SPRING STREET – SUITE 1
New York, New York 10012
[212] 566-8000
[212] 202-4952/FAX
ATTORNEYS FOR PLAINTIFF

**APPENDIX: ADDITIONAL FACT PLEADINGS
IN SUPPORT OF MONELL CLAIMS**

---

## "CONTEMPT OF COP" AND "COVER CHARGE" ARRESTS

---

1. Upon information and belief, police officers in the City of New York and other municipalities nationwide frequently make arrests in the absence of the commission of any crime by the person arrested, motivated by a desire to punish the arrestee for the arrestee's putative failure to display the degree of deference or subservience demanded by the arresting officers. Such arrests are frequently referred to as "contempt of cop" arrests.

2. Upon information and belief, police officers in the City of New York and other municipalities nationwide make "contempt of cop" arrests in the absence of a crime, they frequently justify the arrest by falsely reporting that the arrestee has committed a crime. Such charges are frequently referred to as "cover charges."

3. Upon information and belief, when police officers in the City of New York and other municipalities nationwide frequently charge crimes such as disorderly conduct, resisting arrest, and obstruction of governmental administration as cover charges.

4. On February 28, 2008, the Seattle Post-Intelligencer published an investigative review of six (6) years of Seattle Municipal Court files, wherein the Post-Intelligencer's investigators found that African-Americans in that predominantly Caucasian city were arrested solely on charges of "obstructing a public officer" and related crimes such as resisting arrest eight (8) times as often as Caucasians.[1]

5. The Seattle Post-Intelligencer's investigative review cited above also found that the Seattle City Attorney's Office dropped nearly half of all Seattle criminal cases predicated solely on charges of "obstructing a public officer" and related crimes such as resisting arrest between January 2002 and 2008. See fn1.

6. In response to Seattle Police officers' questionable arrest activities discussed above, "Leo Poort, the [Seattle Police] department's legal adviser, included warnings about obstruction arrests in… her top 12 tips to

---

[1] Nalder, Kamb and Lathrop, "Blacks Are Arrested on 'Contempt of Cop' Charge at Higher Rate," Seattle Post-Intelligencer, February 28, 2008. Article incorporated herein by reference and available online at http://www.seattlepi.com/local/353020_obstructmain28.asp

officers for 'avoiding civil liability lawsuits.' 'Don't arrest for 'contempt' of cop,' she wrote in tip No. 3. 'Officers must be thick skinned and not unduly influenced by the attitudes of persons they contact. Flunking the 'attitude' test (is) not a bookable offense.'" See fn1.

7.  In a review of San Jose criminal cases published on October 31, 2009, the San Jose Mercury News reported that the Santa Clara County Prosecutor declined to prosecute over one-third (33.33…%) of resisting arrest cases brought by San Jose police, a rate that is markedly disproportionate to the Santa Clara County Prosecutor's general twenty percent (20%) decline-to-prosecute rate.[2]

8.  The San Jose Mercury News investigation cited above also found that the San Jose Police Department did not sustain or substantiate civilian complaints with respect to any of the ninety-nine (99) use-of-force cases that it reviewed in 2008, even though the San Jose Independent Police Auditor disagreed with police findings in twenty-five (25) of those 99 cases. See fn2.

9.  In response to the San Jose Mercury News investigation cited above, the San Jose Police Department instituted a new policy of tracking arrests where it appears that resisting arrest is being used as a cover charge to justify unnecessary and excessive police uses of force on civilians. See fn2.

10. A November 19, 1997 New York Times special report on police brutality predicated on perceived or actual disrespect of New York City Police Officers noted that at that time, Defendant CITY OF NEW YORK did not monitor or track police use or levying of charges such as disorderly conduct or resisting arrest.[3]

11. November 19, 1997 New York Times special report on police brutality predicated on perceived or actual disrespect of New York City Police Officers noted that at that time, Defendant CITY OF NEW YORK did not monitor or track police use or levying of charges such as disorderly conduct or resisting arrest, despite considerable anecdotal evidence that New York City Police Officers were arresting individuals on those and other like charges to justify use of force and/or to punish those individuals for "contempt of cop." See fn3.

---

[2] Webby, Sean, "Mercury News investigation: San Jose police often use force in resisting-arrest cases," San Jose Mercury News, October 31, 2009. Article incorporated by reference herein and available online at http://www.mercurynews.com/top-stories/ci_13686438?nclick_check=1
[3] Sontag, Deborah, and Barry, Dan, "CHALLENGE TO AUTHORITY: A special report.; Disrespect as Catalyst for Brutality," New York Times, November 19, 1997. Article incorporated by reference herein and available online at http://query.nytimes.com/gst/fullpage.html?res=9807E7D9163BF93AA25752C1A961958260&scp=8&sq=contempt+of+cop&st=cse&pagewanted=all

12. The above-cited New York Times special report noted that Los Angeles had already instituted a system for tracking the initiation and dispositions of "contempt of cop" and "cover charge" charges such as resisting arrest and disorderly conduct as of the time of that article's publication in 1997. See fn3.

13. Upon information and belief, the policies, customs and practices of Defendant CITY OF NEW YORK, and the New York City Police Department have not changed significantly since the time of that article's publication in 1997.

14. For example, in July 2008, police stopped and arrested Michael Cephus in the Lower East Side area of Manhattan. As reported in the New York Post July 30, 2008, after two officers placed Mr. Cephus on the ground, one of the officers began "whaling away" at Mr. Cephus with his nightstick. Two bystanders captured the beating on video. The two men who filmed the beating were arrested and charged with disorderly conduct.[4]

15. As reported in the New York Daily News on June 16, 2010, Queens councilman Dan Halloran was given a ticket for blocking a crosswalk when he stopped to take pictures of a New York City Police Department vehicle that Mr. Halloran had observed driving recklessly and violating traffic laws on its way to a Dunkin' Donuts.[5]

16. As reported by NBC New York television news on July 22, 2010, two officers who were videotaped beating a defenseless arrestee, Walter Harvin, arrested Mr. Harvin and charged him with resisting arrest and disorderly conduct in order to justify their attack upon Mr. Harvin. One of the officers involved was criminally charged as a result.[6]

17. As reported by a Brooklyn City Councilman in July, 2007, two bystanders observing a young man who was handcuffed and immobilized being beaten by police officers, were themselves beaten and arrested when they asked the officers to stop beating the defenseless arrestee. One of the

---

[4] Alpert, Lukas I., and Weiss, Murray, "2nd Video Gives NYPD Black Eye." New York Post, July 29, 2008.

[5] Trapasso, Clare, "Queens councilman Dan Halloran irate over light-running, yakking traffic cop Daniel Chu," New York Daily News, June 16, 2010. Article incorporated by reference herein and available online at http://www.nydailynews.com/ny_local/queens/2010/06/16/2010-06-16_queens_councilman_dan_halloran_irate_over_lightrunning_yakking_traffic_cop_danie.htm l#ixzz0r1xDq82S.

[6] Scharr, Jillian, "Video Released in Police Brutality Case," NBC New York, June 22, 2010. incorporated by reference herein and available online at a http://www.nbcnewyork.com/news/local/Video-Released-in-Police-Brutality-Case-96882129.html

bystanders was charged with obstruction of governmental administration, resisting arrest and disorderly conduct.[7]

18. A recent article by *Reuters News* sheds light on this unnecessary escalation and creation of more substantial charges in its review of New York Police Department stops. Reuters' analysis showed, particularly in its evaluation of the NYPD'S policing of the Brownsville region of Brooklyn, that the undertaking of contempt of cop arrests often create situations in which individuals who have been stopped by New York City Police Officers for pre-textual or otherwise dubious alleged violations may find themselves facing yet more substantial charges due to the oft-times confrontational nature of police-civilian encounters that may cause the tempers of all parties and participants involved to unnecessarily escalate.[8]

19. Reuters noted particularly the statement of "Anthony Mitchell, who runs an outreach program for young blacks called "Man Up!", [who] says that too often a stop-and-frisk can turn into multiple charges. *Challenging a trespassing or loitering charge can lead to a disorderly conduct charge, and then just a few more wrong moves can add a charge of resisting arrest or even assaulting an officer, a felony*. 'These things can spin out of control easily,' Mitchell said." See fn8 (Emphasis Added).

20. Upon information and belief, Defendant CITY OF NEW YORK and the New York Police Department continue to resist calls for disclosure statistics concerning minor crimes such as the typical "cover charge" crimes.[9]

21. Upon information and belief, the "contempt of cop" and "cover charge" charges levied most regularly by New York City Police Officers are disorderly conduct, resisting arrest, and obstruction of governmental administration.

---

[7] Shabazz, Saeed "Activist lawyers beaten by Brooklyn police," FinalCall.com News, July 12, 2007. Article incorporated by reference herein and available online at http://www.finalcall.com/artman/publish/article_3711.shtml.

[8] Francescani, Chris, et al. "Insight: Under Siege: 'Stop and Frisk Polarizes New York" Reuters, July 3, 2012. Article incorporated by reference herein and available online at http://www.reuters.com/article/2012/07/03/us-usa-newyork-stopandfrisk-idUSBRE86205Q20120703

[9] Rivera, Ray and Baker, Al, "Data Elusive on Low-Level Crime in New York City," The New York Times, Nov. 1, 2010. Article incorporated by reference herein and available online at http://www.nytimes.com/2010/11/02/nyregion/02secrecy.html?scp=1&sq=Data%20Elusive%20on%20Low-Level%20Crime%20in%20New%20York%20City&st=cse.

22. Upon information and belief, "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration are relatively easy for police to levy in the absence of actual probable cause because they may arise out of nearly any police-civilian interactions.

23. Upon information and belief, "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration are relatively easy for police to levy in the absence of actual probable cause because they can be levied solely upon the allegations of the arresting officer(s) without reference to physical evidence or witness observation of criminal acts.

24. Upon information and belief, Defendant CITY OF NEW YORK has been, and continues to be, aware of the prevalence of the problem of officers of the New York City Police Department making baseless "contempt of cop" arrests, and bringing false "cover charges" against the arrestees, but has failed to take action to remedy the problem.

25. Upon information and belief, to date Defendant CITY OF NEW YORK has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

26. Upon information and belief, and despite due and repeated notice that New York City Police Officers have an ongoing custom or practice of charging individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration for personal vindication and/or as pretexts to justify use of force, to date Defendant City of New York has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

27. Upon information and belief, and despite due and repeated notice that New York City Police Officers have an ongoing custom or practice of charging individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date Defendant CITY OF NEW YORK has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

28. Upon information and belief, and despite due and repeated notice that New York City Police Officers such as Defendants have charged and continue to charge individuals with crimes and violations such as resisting arrest, disorderly conduct, obstruction of governmental administration, or fabricating a crime or violation as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date Defendant City of New York has not implemented any particular oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

## UNCONSTITUTIONAL ARREST QUOTAS ILLEGALLY IMPLEMENTED BY THE NEW YORK CITY POLICE DEPARTMENT

29. Upon information and belief, police officers in the New York City Police Department, including the Defendants are required, trained, or encouraged to meet quantitative enforcement "productivity goals" promulgated by policymakers and/or supervisory staff of Defendant CITY OF NEW YORK's police department.

30. Said quantitative enforcement "productivity goals" can also be referred to as arrest quotas.

31. The need to meet arrest quotas can induce police officers to make arrests in the absence of probable cause.

32. Upon information and belief, the arrest quotas promulgated by Defendant CITY OF NEW YORK induce New York City police officers, such as the Defendants herein, to make arrests in the absence of probable cause, in violation of the constitutional rights of individuals to be free from unreasonable seizures.

33. The existence of the aforesaid unconstitutional arrest quota custom and/or policy was confirmed as a finding of fact when, on February 18, 2011, the jury in Bryant v. City of New York, Kings County Supreme Court Docket #022011/2007, found that the plaintiff in that case's arrest had resulted from a policy "regarding the number of arrests officers were to make that violated plaintiff's constitutional rights and contributed to her arrest" imposed by Defendant City of New York.

34. The existence of the aforesaid unconstitutional arrest quota custom and/or policy may additionally be inferred from repeated occurrences of similar wrongful conduct, as documented in lawsuits including but not limited to the following civil rights actions filed against the City of New York:

- **Alvin Williams v. The City of New York et al.,** United States District Court, Southern District of New York, 05 CV 4013.
- **Corey Williams v. The City of New York et al.,** United States District Court, Eastern District of New York, 07 CV 5362.

35. The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the admission by Deputy Commissioner Paul J. Browne, as reported by the media on November 8, 2010, that commanders are permitted to set "productivity goals."[10]

36. The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the posting of lists of quantitative targets for various forms of summonses at the 77th Precinct in Brooklyn. See fn10.

37. Attached hereto as **Exhibit "A"** are copies of the quantitative target sheets obtained from the 77th Precinct by or on behalf of the New York Daily News, as referenced in the aforesaid November 8, 2010 New York Daily News article.

38. The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the full page color advertisement placed by the Patrolmen's Benevolent Association of the City of New York in the May 7, 2012 edition of the New York Daily News, which states, "Don't Blame the Cop[,] Blame NYPD Management For the pressure to write summonses and the pressure to convict motorists[.] Because of ticket quotas, New York City police officers are being pressured to write summonses to as many motorists as possible . . ." A reproduction of the advertisement in question is attached hereto as **Exhibit "B"**.

39. The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the tapes recordings acquired by WABC-TV/DT, including, among other admissions, a 41st precinct sergeant explaining that each of his officers is held to a twenty summons per month and one arrest per month enforcement quota, as reported by the media on March 3, 2010.[11]

---

[10] Fanelli, James, "Cops At Brooklyn's Crime-Ridden 77th Precinct Told To Meet Quotas For Moving Violations, Memos Say," New York Daily News, November 8, 2010. Article incorporated by reference herein and available online at http://www.nydailynews.com/ny_local/2010/11/08/2010-11-08_cops_told_to_meet_quotas.html.

[11] Hoffer, Jim, "NYPD Officer Claims Pressure To Make Arrests," WABC News, March 3, 2010. Articlencorporated by reference herein and available online at http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356.

40. The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the tape recordings acquired by the Village Voice, including, among other admissions, an 81st precinct sergeant telling his officers to make "special" arrests as directed by their superiors even if they must void the arrests at the end of their shifts, as reported by the media on May 11, 2010.[12]

## THE PRACTICE AND CUSTOM OF THE NEW YORK CITY POLICE DEPARTMENT OF PERMITTING ITS OFFICERS TO ENGAGE IN POLICE BRUTALITY AND USE OF EXCESSIVE FORCE

41. Upon information and belief, Defendant CITY OF NEW YORK tacitly condones its police officers' continuing and widespread practice of undertaking extraordinary and unjustified uses of force against persons and persons' property.

42. In doing so, Defendant CITY OF NEW YORK has failed to act to remedy this ongoing practice where other municipalities, faced with notice of similar issues, have taken meaningful affirmative steps to curb said tendencies among their own police officers.

43. The non-governmental organization Human Rights Watch conducted a study examining common obstacles to accountability for police abuse in fourteen large cities, including Atlanta, Boston, Chicago, Detroit, Indianapolis, Los Angeles, Minneapolis, New Orleans, New York, Philadelphia, Portland, Providence, San Francisco, and Washington, D.C.[13]

44. Research for this report was conducted over two and a half years, from late 1995 through early 1998. See fn13.

45. The report stated: "The barriers to accountability are remarkably similar from city to city. Shortcomings in recruitment, training, and management are common to all. So is the fact that officers who repeatedly commit human rights violations tend to be a small minority who taint entire police departments but are protected, routinely, by the silence of their fellow

---

[12] Rayson, Graham, "The NYPD Tapes, Part 2: Bed-Stuy Street Cops Ordered: Turn This Place Into A Ghost Town." Village Voice, May 11, 2010. Article incorporated by reference herein and available online at http://www.villagevoice.com/2010-05-11/news/nypd-tapes-part-2-bed-stuy/.

[13] "Shielded from Justice: Police Brutality and Accountability in the United States," Human Rights Watch, June 1998. Report incorporated by reference herein and available online at http://www.columbia.edu/itc/journalism/cases/katrina/Human%20Rights%20Watch/uspohtml/toc.htm.

officers and by flawed systems of reporting, oversight, and accountability. Another pervasive shortcoming is the scarcity of meaningful information about trends in abuse; data are also lacking regarding the police departments' response to those incidents and their plans or actions to prevent brutality. Where data do exist, there is no evidence that police administrators or, where relevant, prosecutors, utilize available information in a way to deter abuse." See fn13.

46. The report documented that the official response of the New York City Police Department and the City of New York, to credible, persistent reports of abuse was to deny the existence of the problem. See fn13.

47. The report documented that the New York City Police Department, and the City of New York failed to discipline officers in all but 1% of incidents in which complaints were filed with the Civilian Complaint Review Board. See fn13.

48. Upon information and belief, the report was presented to Mayor Rudy Giuliani of the City of New York.

49. Upon information and belief, the Mayor denounced the report without reading it.

50. Upon information and belief, Kenneth Roth, then Executive Director Human Rights Watch wrote in an open letter to the Mayor on July 14, 1998: "Rather than engage in a serious discussion of the problem of police brutality in New York City, you attacked those who raised the issue -- apparently without even reading the advance copy of the report we had sent you."

51. Upon information and belief, Defendant CITY OF NEW YORK has been, and continues to be, aware of the prevalence of the problem of officers of the New York City Police Department engaging in excessive force, but has failed to take action to remedy the problem.

52. Upon information and belief, Defendant CITY OF NEW YORK continues to resist collection and disclosure of data concerning the prevalence of police brutality, choosing to conceal the problem from the public in order to continue its policy of acquiescence in such practices without fear of public or political backlash.

53. Upon information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit shortcomings and deficiencies in the New York City Police Departments' recruitment, training, and management practices that allow the practice and custom of the use of excessive force

and police brutality by the police officers of the New York City Police Department to continue.

54. Upon information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit flawed and/or deficient systems of reporting, oversight, and accountability that allow the practice and custom of the use of excessive force and police brutality by the police officers of the New York City Police Department to continue.

DATED:    New York, New York
          November 30, 2012

Respectfully submitted,

SAMUEL B. COHEN [SC 0622]
STECKLOW, COHEN & THOMPSON
10 Spring Street Suite 1
New York, New York 10012
[212] 566-8000
[212] 202-4952/FAX
ATTORNEYS FOR PLAINTIFF
ROY COOPER

# EXHIBIT A

GOOD DAY WE NEED THE FOLLOWING FOR
THE WEEK: 4/5-4/11

CELLPHONE     60
SEATBELTS     50
DBL PKS       65
BUS STOPS     40
TINTS         25
TRUCK RTES    2

PLEASE HAVE SUMMONS ISSUED AT APL'S:
ST JOHNS SCHENECTADY
UTICA/ST MARKS
EPKWY/WASHINGTON
PARK/VANDERBILT
EPKWY/ALBANY
    *Please be advised these are new apl locations*

PLEASE ISSUE HANDICAPPED SUMMONS ON ALL TOURS

THANK YOU

10/18/10

FOR THE WEEK OF 10/18- 10/24 WE NEED:

DBL PKRS     25
BUS STOPS    15
SEATBLTS     50
CELLPHNS     75
TINTS         6
TRUCK RTE     5


Thank you,

# EXHIBIT B



# Don't Blame the Cop

# Blame NYPD Management

For the pressure to write **summonses** and the pressure to convict motorists

Because of ticket quotas, New York City police officers are being subjected to undue **pressure to write** summonses to as many motorists as possible. And for some reason, once the case gets to traffic court, they are being subjected to undue **pressure to convict** as many motorists as possible. In the first instance, the pressure comes in the form of lousy assignments, denial of transfer requests, unwanted transfers and other penalties. And in traffic court, where Internal Affairs supervisors are assigned for the sole purpose of punishing officers, the pressure comes from the risk of losing three vacation days — worth more than $900 — if the motorist is found not guilty. With all these pressures, the cop loses, the public loses and the traffic court justice system loses. The only winner may be the city's treasury, which collects either from the cop or the motorist.



**Patrolmen's Benevolent Association**
of the City of New York

125 Broad Street, 11th Floor, New York, NY 10004 • 212-233-5531

**Patrick J. Lynch, President**